IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| TAMMI LEWIS PACE,  )  | CIVIL ACTION 4:09-1359-PMD-TER |
| )  | |
| Plaintiff,  )  | |
| )  | |
| v.  )  | |
| )  | REPORT AND RECOMMENDATION |
| MICHAEL J. ASTRUE,  )  | |
| COMMISSIONER OF SOCIAL  )  | |
| SECURITY,  )  | |
| )  | |
| Defendant.  )  | |
| _____ )  | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

**I. PROCEDURAL HISTORY**

The claimant, Tammi Lewis Pace, filed applications for DIB on September 13, 2004, alleging disability since August 31, 2003, due to benign brain tumor, vison loss in her right eye, back problems, and memory problems. (Tr. 46-50. 117). Her application was denied initially and upon reconsideration. Following a hearing, the Administrative Law Judge (ALJ) found in a decision dated September 17, 2008, that plaintiff was not disabled. The Appeals Council's denial of

plaintiff's request for review of the ALJ's decision made it the Commissioner's final decision for purposes of judicial review. (Tr. 7-9).

## II. FACTUAL BACKGROUND

The plaintiff was forty (40) years old at the time of the administrative hearing before the ALJ. (Tr. 573 ). Plaintiff has a high school education and two years of technical college. Plaintiff has past relevant work as an assistant critical care instructor, clerical worker, administrative assistant, and assistant gift shop manager. (Tr. 25).

## III. DISABILITY ANALYSIS

The plaintiff's arguments consist of the following:

(1) The ALJ improperly discounted the opinions of two treating physicians, Dr. Holdren and Dr. Lupo, who found that Pace was disabled.

(2) The ALJ did not properly consider and weigh the substantial difficulties Pace has had and does have with chronic headaches.

(3) The ALJ's decision is not based on the substantial evidence in the record and has erroneous factual findings not supported by the record.

(4) The ALJ proposed an amended onset date on the record and when Pace refused to amend, completely denied her claim.

(Plaintiff's brief).

In the decision of September 17, 2008, the ALJ found the following:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

(2) The claimant has not engaged in any substantial gainful activity since August 31, 2003, the alleged onset date. (20 CFR 404.1520(b) and 404.1571 et seq.).

(3) The claimant has the following severe impairments: degenerative disc disease and asthma (2 status post brain tumor (meningioma), partial right eye blindness, degenerative disc disease, neuropathy, fibromyalgia, and anxiety (20 CFR 404.1520(c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

(5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform reduced light exertion work as defined in 20 CFR 404.1567(b). I specifically find that she can lift or carry 20 pounds occasionally and 10 pounds frequently, and she can sit for six hours of an eight-hour work day and stand or walk for two hours of an eight hour work day, but she needs a sit/stand option at will. I also find that she can occasionally climb a ramp or stairs, as well as occasionally balance, stoop, kneel, crouch, and crawl. I find that she can never climb a ladder, scaffold, or rope, that she needs to avoid concentrated exposure to workplace hazards such as unprotected heights and moving machinery, and she has limited depth perception (but with the ability to drive). I also find that the claimant can perform detailed but not complex tasks with no more than a SVP of 3 or 4.

(6) The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7) The claimant was born on September 16, 1967. She was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

> (9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> (10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), and 404.1566).
>
> (11) The claimant has not been under a "disability," as defined in the Social Security Act, from August 31, 2003, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-27).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be

upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a (1988). An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a). Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and proper legal standards were applied. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if she can return to her past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.

SSR 82-62. The claimant bears the burden of establishing her inability to work within the meaning of the Social Security Act. 42 U.S.C. § 423 (d)(5). She must make a prima facie showing of disability by showing she was unable to return to her past relevant work. Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

### IV. PLAINTIFF'S SPECIFIC ARGUMENTS

Plaintiff argues that the ALJ failed to give controlling weight to the opinions of two treating physicians, Dr. Holdren and Dr. Lupo. Plaintiff also argues that despite the overwhelming evidence, the ALJ found no basis for the findings of Dr. Lupo and Dr. Holdren that plaintiff could be expected to miss as least four days of work per month. The plaintiff argues that Dr. Holdren's opinion is well supported by the medical evidence in the record. Plaintiff asserts that Dr. Holdren saw her at least eleven (11) times between December 14, 2006, and January 16, 2008. Plaintiff argues that the ALJ does not make reference to any medical evidence which contradicts Dr. Holdren's statements.

The Commissioner asserts that there was substantial medical evidence to support the decision of the ALJ. Defendant argues the ALJ was correct in not giving Dr. Holdren's and Dr. Lupos' opinions controlling weight as it was inconsistent with their own findings and recorded conclusions.

The opinion of a physician will be given controlling weight if it is supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d) (1997); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (although not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it.); Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983)(a treating physician's opinion should

be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."). The legal standard which applies is contained in 20 C.F.R. § 404.1527. Under § 404.1527, the opinion of a treating physician is entitled to more weight than the opinion of a non-treating physician. It is only given controlling weight, however, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the[ record." See 20 C.F.R. §404.1527(d)(2).[1] Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Under § 404.1527, if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must then consider the weight to be given to the physician's opinion by applying five factors identified in the regulation: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 30 C.F.R. 404.1527(d)(2)(i-ii) and (d)(3)-(5). Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion

---

[1] This standard, of course, is more stringent than the old "treating physician rule," which accorded a treating physician's opinion controlling weight unless the record contained persuasive evidence to the contrary. See Coffman, 829 F.2d at 517.

7

should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Id.

A review of the ALJ's decision reveals that he thoroughly discussed plaintiff's medical evidence. The ALJ discussed the reports and opinion of Dr. Lupo as follows:

> On October 12, 2006, psychiatrist Perry I. Lupo, M.D., performed an initial psychiatric evaluation of the claimant and diagnosed depressive disorder. Dr. Lupo noted that the claimant's mood was dysphoric, but she was alert and oriented in all spheres, her affect was appropriate to the situation, her thought processes were logical and goal directed, she appeared of average intellect, and her memory and cognition was grossly intact.
>
> . . .
>
> On August 28, 2007, Dr. Lupo made an assessment of the claimant's mental status, noting that he had been treating her since October 12, 2006. Dr. Lupo diagnosed depressive disorder and concluded that the claimant had a "seriously limited, but not precluded" ability to interact appropriately with the general public, travel in an unfamiliar place, and use public transportation. Dr. Lupo concluded that the claimant was "Unable to meet competitive standards" in several areas, including maintaining regular attendance, performing at a consistent pace, and dealing with normal work stress. Dr. Lupo also found that the claimant had a "limited but satisfactory" ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. In addition, Dr. Lupo concluded that the claimant could be expected to miss more than four days of work per month due to her mental status. I find Dr. Lupo's assessment to be unsupported by the objective medical evidence taken as a whole, and I will address this in greater detail below.

As to the medical reports and records of Dr. Holdren, the ALJ discussed as follows:

> On September 25, 2007, treating pain specialist Rebecca Holdren, M.D., completed an assessment form addressing the claimant's physical limitations and concluded that she could only sit, stand or walk for less than two hours of an eight hour work day, and rarely lift or carry 10 pounds. Dr. Holdren also concluded that the claimant could rarely twist and never stoop, crouch, squat, and climb a ladder or stairs. Overall, Dr. Holdren described an individual with virtually no physical ability to do anything. I

also find this assessment to be unsupported by the objective medical evidence, and I will address this below as well.

Treatment notes from Dr. Holdren through January 16, 2008, show that the claimant was followed for muscle spasms, myofascial pain/fibromyalgia, unspecified neuralgia, and neoplasm of unspecified nature. Dr. Holdren prescribed MS Contin and Lortab and noted that the claimant was in physical therapy. On January 16, 2008, the claimant reported that she was doing well with PT and "meds are helping."

(Tr. 20).

With respect to Dr. Holdren's and Dr. Lupo's opinions the ALJ concluded as follows:

As for the assessments of Dr. Holdren and Dr. Lupo, I found both of these to be largely out of touch with the objective medical findings documented in the remainder of the record. For example, Dr. Holdren indicated that the claimant can rarely flex her neck to look down or up, turn her head right or left, or hold her head in static position (Exhibit 23F, pg.4). However, at the hearing, I observed the claimant bring her chin to her chest while pointing to a problem in her neck. I also observed her turn her neck to the left, almost parallel to her shoulder, while standing and facing a wall. I also find no basis for Dr. Holden's rather extreme list of limitations, including the inability to lift even 10 pounds on more than a rare basis. Based on her reports of activities of daily living, I have evidence that she can lift and carry more than this. As for Dr. Lupo's assessment, I find that his own notes in Exhibit 30F contradict the assessment found in Exhibit 22F. His assessment is also contradicted by the report of Dr. Jones[2], a consulting psychologist, and Dr. Wilson[3] a treating physician, in

---

[2] The ALJ previously discussed the report from Dr. Jones finding that he diagnosed plaintiff with "suspected major depressive disorder, single episode versus dysthymia." (Tr. 19, 314). The ALJ stated the following:

. . . Dr. Jones found that she was able to attend to her daily needs and avoid dangers, and she demonstrated the ability to follow verbal instructions and present ideas in a clear and coherent manner. Dr. Jones also found that the claimant was knowledgeable of appropriate behavior for interacting with peers, employers, and the general public, and she had "sufficient intellectual ability to perform a routine repetitive task for monetary gain." The claimant report that she spends more of each day taking care of her four children, folding clothes, and performing light household chores. She also reported that she would occasionally prepare meals and help with cleaning, and she enjoyed crocheting and cross-stitching. The claimant reported to Dr. Jones that she had considerable pain when sitting still, but later admitted that she enjoyed sitting on the porch and watching people go by.

9

Exhibit 21F. Furthermore, I find no basis for the finding by Dr. Lupo and Dr. Holdren that the claimant could be expected to miss at least four days of work p[e]r month.

For these reasons, I afford little weight to the opinions of Dr. Lupo and Holdren, and I find that the claimant's statements concerning the intensity, persistence and limiting effects of her pain are not fully credible. After sorting through the medical evidence, I find that the residual functional capacity I have put forth accounts for all impairments and limitations. I find no basis to limit her residual functional capacity any further.

(Tr. 24-25).

The undersigned finds there is substantial evidence in the medical record to support the ALJ's decision and the amount of weight he placed on the opinions of Dr. Holdren and Dr. Lupo. The ALJ fully set forth his reasoning for not giving controlling weight to their opinions. As noted above, this court's review is limited to whether the ALJ's findings are supported by substantial

---

Also a review of Dr. Jones' report by the undersigned reveals that he stated the following; "The review of history indicates the applicant has been able to maintain employment for significant periods of time. Sum total findings indicate this applicant does have sufficient intellectual ability to perform a routine repetitive task for monetary gain." (Tr. 314).

[3] As to Dr. Wilson, the ALJ stated the following in his decision:

> Treatment notes from Pamela K. Wilson, M.D. dated March 17, 2006, May 18, 2006, and June 29, 2006 show that the claimant was followed for hypertension, fibromyalgia, classic migraines, paresthesia, edema, and allergic rhinitis. On March 17, 2006, Dr. Wilson noted: "I have asked her to try to do some regular aerobic activity on a daily basis." during that visit, the claimant complained of back pain after "extra work with her recent move." I note that the claimant reported "paresthesias" in her legs, hand and lips, but that "symptoms come and go, vary in duration." I note that, on an unspecified date, Dr. Wilson completed an assessment of the claimant's mental status for the State agency and noted that, while the claimant tended to be anxious and depressed, she had good attention and concentration, appropriate thought content, and intact thought processes. Exhibits 21F and 29F.

evidence and whether he applied the correct law. The ALJ noted that Dr. Lupo's assessment was contradicted by his own notes, by Dr. Wilson, a treating physician, and by Dr. Jones, the consulting psychologist. In deciding to discount Dr. Holdren's and Dr. Lupo's opinions, the ALJ cited condradictory findings by other physicians such as Dr. Wilson and Dr. Jones. A review of Dr. Jones' report reveals that he stated "the applicant was compliant with the examination but did not appear to perform at her maximum level." (Tr. 313). Dr. Jones further stated that she "spends most of her day taking care of her children, folding clothes, and performing light household chores. She does occasionally prepare meals and helps with some of the cleaning. . . . she has considerable pain when sitting still. It is noteworthy, however, that she enjoys sitting on the porch and watching people go by." (Tr. 313). Dr. Jones found the following:

> The current evaluation indicates a disruption in the efficiency of memory. The difficulty appears to be a function of the emotional factors rather than a failure in primary memory systems. The results are noteworthy that the applicant described her memory problems as being variable. She did not interview and stated that her principle difficulties stem from pain in her back and pain stemming from the fibromyalgia. The applicant is able to do reading and writing as a means of receiving and conveying information. She is able to attend her daily needs and avoid dangers to her health. She has functional use of upper extremities. She did not have difficulty understanding and following verbal instructions or presenting ideas in a clear and coherent manner. She is knowledgeable of appropriate behavior for interfacing with peers, employers, and the general public. The review of history indicates the applicant has been able to maintain employment for significant periods of time. Sum total findings indicate this applicant does have sufficient intellectual ability to perform a routine repetitive task for monetary gain. The problems that will interfere with her ability to use this potential in a consistent manner include the fibromyalgia and complaints of pain and extreme obesity.

(Tr. 314).

The ALJ explained his assessment and relied upon the records of a consulting physician and a treating physician. Thus, the ALJ's findings are supported by substantial evidence, and they must be affirmed.

11

Plaintiff next argues that the ALJ did not properly consider and weigh the substantial difficulties she has had and does have with chronic headaches. The Commissioner argues that the ALJ's discussion of her medical evidence references plaintiff's migraine headaches as does his discussion of plaintiff's hearing testimony. (Tr. 19-21). The Commissioner asserts that the ALJ explained that plaintiff reported to Dr. Absher, plaintiff's neurologist, and stated that her headaches were primarily during her menstrual cycle. Defendant asserts while the medical evidence does support plaintiff's allegation that she had headaches, the evidence did not show they were of disabling severity. The Commissioner stated that in October 2006, just two months before Dr. Holdren set out her limitations, Dr. Absher, stated that plaintiff's headaches had been "much improved" since the addition of Topamax five months earlier, and, at no point did Dr. Holdren or Dr. Wilson impose any work-related functional limitations due to headaches plus plaintiff previously worked despite her migraine headaches. Therefore, the Commissioner argues that the evidence does not reveal that plaintiff's headaches caused functional limitations in excess of this residual functional capacity assessment for any consecutive 12 month period.

A review of the ALJ's decision reveals that he stated the following with regards to plaintiff's headaches, "[a]s for her headaches, I find these to be non-severe as well. She admitted at the hearing that these were primarily tied to her menstrual periods, as she reported to Dr. Absher." (Tr. 21). While the medical records do reveal that plaintiff was diagnosed and complained of headaches, there is no indication that any of her medical physicians placed any limitations on her functional capacity due to her headaches. A review of the hearing transcript reveals plaintiff testified that her headaches began to return after her brain tumor was removed and she began to come off some of the medication. (Tr. 579). Plaintiff further testified that she was placed on medications for her headaches

12

which she stated "helps. (Id.). She went on to testify that "I don't have them every day. I have them a couple times a week. I have them really bad during my menstrual cycle. . .," and then for those breakthrough migraines, she has Imitrex shots and pills. (Id.). Based on a review of the evidence, there is substantial evidence to support the conclusion of the ALJ.

Plaintiff next argues that "the ALJ made many substantive findings in the order that are simply not consistent with the evidence in the record in this case and are not representative of Pace's abilities." (Pl. Brief, p. 17). Plaintiff argues that several of the ALJ's findings are "suspect" and not based on the evidence. The Commissioner argues that the ALJ's findings are representative of the record evidence.

Plaintiff argues that the ALJ erred by improperly considering her demeanor when being questioned at the hearing. Specifically plaintiff refers to the following findings by the ALJ: "In addition, I find the claimant's demeanor at the hearing makes her credibility suspect. To my questions, she was unable to give answers and cried. To her attorney's questions, she gave responsive, detailed answers, dates, and names of medications." (Tr. 24).

Here the ALJ made an observation of how plaintiff responded to his questions. The ALJ further noted that "[d]uring questioning by her attorney regarding back pain, she was able to give an immediate date as to when her back pain started. When I questioned about her employment, she cried and said she could not remember when she quit work. I found this to be an odd inconsistency." (Tr. 24). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (*citing* Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

13

Plaintiff next argues that the ALJ erred by mischarterizing her daily activities when he found that she "Reported that she could clean up after herself, shop for groceries and household items using an electric cart, manage the finances, engage in needle work activities, go to th pool with a friend twice a week, walk in the shallow end of the pool, visit at a friend's house twice a week and visit outside her home with relatives." (Tr. 24, pl. brief p. 18).

With regard to this issue, the ALJ stated the following:

> The claimant testified that she quit work 3 months prior to delivering her last child due to back pain and difficulty walking. She never returned to work and has not looked for work. The claimant's written statements of record reveal that she has engaged in more daily activities than she testified. The claimant reports that she changed youngest child's diapers (born in November 2003), and dressed and fed him as an infant. She also noted that she reads to him and watches him play (Exhibit 3E, pg. 2). In addition, the claimant reported that she could clean up after herself, shop for groceries and household items using an electric cart, manage her finances, engage in needlework activities, go to the pool with a friend twice a week, walk in the shallow end of the pool, visit at a friend's house twice a week, and visit outside her home with relatives. (Exhibit 3E).

Tr. 24).

The ALJ cited to portions of the record reflecting activities plaintiff indicated she was able to conduct. Thus, there is substantial evidence to support the ALJ's conclusions. Further, the ALJ relied on other evidence of record in making his decision, not just plaintiff's daily activities.

Plaintiff next argues that the ALJ based his finding of plaintiff's functional use of the upper extremities on the opinion of a psychologist while not giving weight to the treating physician's opinions such as Dr. Holdren. The Commissioner responds that there was other medical evidence to support the ALJ's findings in this regard and the argument should be rejected.

A review of the ALJ's decision reveals that he stated the following with regard to this issue:

> I also find that the claimant's allegations of disabling bilateral wrist pain and hand numbness are not consistent with the objective medical evidence. The claimant

> complained of new onset of tingling in her hands in October 2007. EMG/nerve conduction studies confirmed mild median mononeuropathy at the right wrist without denervation (Exhibit 34F, pg. 5). Surgery has not been recommended and she is merely treated with a wrist brace worn on the right wrist at night.
>
> The claimant also testified that writing exacerbates wrist pain. However, it appears from her written reports of record that she is able to write extensively. A consulting psychologist specifically noted that the claimant has functional use of her upper extremities. (Exhibit 18F. Pg. 3). Also, the clinical evidence documents moderate degenerative changes at L2 and stenosis at L4-5, but the claimant has essentially normal physical findings pertaining to her neck, back and extremities. (Exhibit 20F).

(Tr. 24).

The report (Exhibit 20F) that the ALJ cited was that of her treating physician, Dr. Gardner of Southeastern Neuro and Spine, who revealed that "[n]umbness and pain in right hand has improved" and right and left upper and lower extremities were normal. (Tr. 332-333). Further, the ALJ noted in the decision that plaintiff had reported bilateral wrist pain and numbness in her hands due to carpal tunnel syndrome but that plaintiff testified that she had carpal tunnel syndrome. The ALJ stated " I found only one reference to this–on January 30, 2006, Dr. Agha scribbled 'FM/CTS' (Exhibit 28F/2), but this was not mentioned again and not picked up by any other physician. It appears that the claimant's sensation complaints have been attributed to neuropathy." (Tr. 21). He further found that she had not had surgery, only wears a wrist brace at night and that "I find carpal tunnel syndrome is not a "severe" impairment in this case." (Tr. 21). There is substantial evidence to support the decision of the ALJ in regards to this issue.

Plaintiff next argues that the ALJ's finding that "also, the clinical evidence documents moderate degenerative changes at L3 and stenosis at L4-5, but the claimant has essentially normal physical findings pertaining to her neck, back, and extremities (Exhibit 20F)" (tr. 24) is not reflective of the evidence in this case, specifically her MRI. The Commissioner argues that the

15

ALJ's evaluation of the medical evidence was sufficient to show he considered it, and trace the path of his reasoning which is all that was required. Citing Wyatt v. Bowen, 1989 WL 117940 (4th Cir. 1989).

The Exhibit (20F) to which the ALJ cited for reliance on his finding was the examination by Dr. Gardner of Southeastern Neuro and Spine. The ALJ set out the medical records of the plaintiff in the decision with respect to the MRI as follows:

> On August 8, 2005, an MRI of the claimant's lumbar spine showed facet joint synovial cysts at L4-5 and L1-2, as well as mild diffuse disc bulging at L1-2, L2-3, and L3-4, and moderate spinal canal narrowing at L4-5. Exhibit 14F, pages 1-2.
>
> Treatment notes from rheumatologist Amir Agha, M.D. dated June 6, 2005, June 30, 2005, and August 25, 2005, show that the claimant was diagnosed with fibromyalgia, morbid obesity (326 pounds at 5'6" tall), and a history of spinal stenosis. The claimant reported a history of joint pain for several years, and that she stayed tired and had no energy. Dr. Agha noted that the claimant's joint pain was due to fibromyalgia–"I do not see any evidence of synovitis or muscle weakness . . . Encouraged her to lose weight." Exhibit 10F.

(Tr. 18). Later in the decision, the ALJ notes that "On November 9, 2005, an MRI of the claimant's cervical spine showed a disfuse posterior disc protrusion at C5-6. The MRI was ordered due to concerns about reported paresthesias of the right arm and neck pain." (Tr. 19). Therefore, the ALJ did discuss the MRI results in his decision. However, the ALJ relied on the report from Dr. Gardner, a treating physician. Therefore, there is substantial evidence to support the ALJ decision with regard to this issue.[4]

---

[4]This court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson, 402 U.S. at 390. Even where the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the

Lastly, plaintiff asserts that "the ALJ proposed an amended onset date on the record, and then, when the claimant was unwilling to amend, completely denied her claim." (Plaintiff's brief). The Commissioner argues in response that it is true the ALJ asked plaintiff whether she would be willing to amend her onset date to October 29, 2007, the day her podiatrist completed testing that revealed neuropathy in her feet. However, the defendant argues there is no evidence to support plaintiff's argument that the ALJ's recommendation created a clear inference that the ALJ thought plaintiff was disabled as of that date. Defendant asserts that the ALJ based his decision on subsequent vocational expert testimony that an individual with all of the limitations the ALJ ultimately found supported by the record could perform jobs in the national economy.

A review of the record reveals the following colloquy took place between the ALJ and plaintiff's counsel:

ALJ: In the process of doing a residual functional capacity, essentially, I've got to complete–the question that I have and the issue in this case is the foot problem and walking. Although that probably would only limit her to sedentary work. The nerve conduction study was essentially normal. Suggestive of media [phonetic] nerve pathology. Anyway, the bottom line is there's information from the records previously that the numbness and pain was improved. The question is the degree. I can tell you right now my residual functional capacity would be a sit-stand option at the light level. Have non-exertionals posturally. Manipulatively. Detailed, not complex work. Depth perception limitation. If you want to go out and talk to your client about amended onset date of October 29, 2007, I might consider that date, if you want to talk to her about it.

ATTY: October of '07?

ALJ: October 29, 2007.

---

evidence, and this court cannot reverse that decision merely because the evidence would permit a different conclusion. <u>Shively v. Heckler</u>, 739 F.2d at 989.

| | |
|---|---|
| ATTY: | Can I just understand why that date? |
| ALJ: | That's when the testing was done with the podiatrist. That's what gave rise to my questions about it. If you're not interested, I'll just–I told you what my hypothetical is going to be. |
| ATTY: | I understand. |
| ALJ: | I might have some variations on it. |
| ATTY: | But can I point out, Your Honor, that August the 8th, 2006, she had an abnormal– |
| ALJ: | I am aware. And if you want to do that, that's fine. Otherwise, I want to get to the VE. I have another case. |
| ATTY: | I understand that. But I was just asking you–that date, I can't advise my client without understand[ing] why, is why I asked you the question. |
| ALJ: | I just told–that's what gave rise to my questions about the foot. And it's the Piedmont Podiatry that gave rise to that date. |
| ATTY: | Well– |
| ALJ: | If you'd like to go outside and talk about it, that's fine. |
| ATTY: | If I could just have a minute with her- - |
| ALJ: | Certainly. |
| ATTY: | - - I'll do that. I'm not sure she's going to –okay. You want to walk out here just a minute and talk to me? Your Honor, she's not willing to amend her onset date to October of 2007. And just an explanation, a part of that reason– |
| ALJ: | I don't need it you to give me [sic]. |
| ATTY: | If you don't want to, that's fine, I was going to explain to you why, but that's fine. |
| ALJ: | You know, I have the hypothetical. I'm going to give two spin-offs. I don't know what the vocational expert is going to say. And he may very well find her disabled at the first date based on my hypothetical. He may not. I have no clue at this point. |

(Tr. 600-602).

Based on a review of this colloquy, the ALJ did not state that he would grant her disability if she amended her onset date. Even though it could be interpreted by counsel that the ALJ would award from the amended onset date forward, the ALJ never stated he would or gave any assurance that he would find plaintiff disabled if the onset date was amended. The ALJ stated that he would consider the date. Further, the ALJ explained that he was going to submit the hypothetical to the VE and did not know what the VE would testify in response. The undersigned concludes that no agreement was made that the ALJ would grant plaintiff disability if she agreed to amend her onset date. Even if the ALJ had agreed to grant disability if plaintiff amended her onset date, the ALJ would still be required to make any ruling on disability based on the evidence. See Lamp v. Astrue, 2009 WL 412884 (N.D.W. Va. 2009).

### VI. CONCLUSION

Despite the plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, this court concludes that the ALJ's findings are supported by substantial evidence and recommends the decision of the Commissioner be affirmed. Therefore, it is

RECOMMENDED that the Commissioner's decision be AFFIRMED.

                                                  Respectfully submitted,

                                                  s/Thomas E. Rogers, III
                                                  Thomas E. Rogers, III
                                                  United States Magistrate Judge

July 30, 2010
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**